# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| In Re:<br><br>Larry T. Kimmes, Sr.,<br><br><br>Debtor. | Bankruptcy Case<br>No. 11-40045-JDP |
| Larry T. Kimmes, Sr.,<br><br>Plaintiff,<br><br>vs.<br><br>D.L. Evans Bank,<br><br>Defendant. | Adv. Proceeding<br>No. 12-08067-JDP |

## MEMORANDUM OF DECISION

**Appearances:**

Brent T. Robinson, Rupert, Idaho, Attorney for Plaintiff Larry T. Kimmes, Sr.

MEMORANDUM OF DECISION – 1

Jason R. Naess, Parson, Smith, Stone, Loveland and Shirley, Burley,
Idaho, Attorney for Defendant D.L. Evans Bank

### Introduction

Plaintiff, chapter 12[1] debtor Larry T. Kimmes, Sr. ("Kimmes"),

commenced this adversary proceeding against Defendant D.L. Evans Bank

("Evans").  Adv. Dkt. No. 1.  At issue, at least according to a fair reading of

the complaint, was whether Kimmes owed Evans any amount on a loan

number ending 5225 from Evans to Kimmes.

The Court conducted a four-day trial in this action.  At the

conclusion of the wide-ranging presentation of evidence and testimony by

the parties focusing on all aspects of the parties' former business

relationships, the Court took the issues under advisement and the parties

filed briefs.  Dkt. Nos. 64, 65, and 66.  The Court has carefully considered

the record, the evidence, and the testimony presented at trial, as well the

post-trial arguments of the parties.  This Memorandum constitutes the

---

[1] Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, all rule references are to the Federal
Rules of Bankruptcy Procedure, Rules 1001 – 9037, and all civil rule references
are to the Federal Rules of Civil Procedure, Civil Rules 1 – 86.

MEMORANDUM OF DECISION – 2

Court's findings of fact and conclusions of law, and disposes of the issues.

Rule 7052.[2]

*Facts*[3]

## I.    Events Leading to Kimmes' Chapter 12 Filing: Loans for Loans

The issues between the parties arose from what became a highly

strained relationship between a local bank and its customer.  While, at

times, Kimmes' treatment by the bank was perhaps less than courteous,

diligent, or professional, the Court's challenge is to discern whether the

bank's actions during the parties' dealings rose to the level of actionable

---

[2]  The Court concludes that it has jurisdiction over this action under 28 U.S.C. § 1334(b).  This action, and resolution of the issues raised herein, constitute "core" proceedings under 28 U.S.C. § 157(b)(2)(A) and/or (B), (C) and (O).  The Court has also determined it has the constitutional authority to enter final judgments and orders in this matter.  To the extent it is necessary, the Court finds the parties have both expressly, and through their acquiescence and active participation in the trial of the issues raised in this action, impliedly consented to the entry of a final judgment by this Court.  In the alternative, even if one or both of the parties have not consented, they have waived or forfeited any right to object to the Court's authority to finally determine the issues.

[3]  The parties disputed many of the material facts.  The facts recited in this Memorandum represent those found by the Court after due consideration of the parties' varying positions.  These findings also reflect the Court's assessment of the credibility of the witnesses who testified, and the relative weight to be afforded to all of the evidence offered at trial.

MEMORANDUM OF DECISION – 3

wrongdoing.

Kimmes is the president and sole owner of G&L Land and Livestock, Inc. ("G&L").  He owns and operates a farm near Gooding, Idaho.  In the late 1990's, because of losses from farming, federal tax liens were lodged against Kimmes' property.  Exhs. 100 at 2 and 125.  In 2003 and in 2005, Kimmes had state tax liens placed against his property.  Exh. 125.

Adding to these financial woes, in 2006, the home owned by Kimmes and his spouse was destroyed by fire.  After collecting $160,000 in insurance payments, Kimmes attempted to construct what he referred to as a "foam panel" house.  While he spent all the insurance money in this effort, the house was never completed, and what was constructed had to be torn down, he alleges, as the result of the errors and negligence of his contractor.  Kimmes was unable to recover any of the amount paid to the builder.  After these setbacks, Kimmes and his wife decided to construct a "stick built" house in 2008.  The construction expenses they incurred, along with the costs of operating G&L and his farm during this time, set

MEMORANDUM OF DECISION – 4

the stage for the conflict between the parties to this litigation.

While he previously banked elsewhere, in 2000, a neighbor-friend suggested to Kimmes that he bank with Evans. G&L, through Kimmes, initiated a business relationship with Evans. Over the course of the following years, Kimmes and G&L obtained several large loans from, and maintained checking accounts with, Evans, both in his name and for his corporation. Exh. 200. Typically, the proceeds from the loans he received from Evans were deposited in G&L's checking account with Evans. *See id.*

In November 29, 2007, G&L borrowed $50,392 from Evans on Loan Number 4600. Exh. 208 at 2. Soon thereafter, on January 10, 2008, G&L borrowed $100,510 on Loan Number 4656. After exhausting those loan funds, in April, 2008, G&L obtained an operating loan, Loan Number 4814, from Evans for $237,213. Exh. 208 at 1. The proceeds of this loan were used to pay off the amounts due on Loan Numbers 4600 and 4656, together with providing G&L additional operating capital in the amount of $85,098. Exhs. 209 and 225. The promissory note for this loan explained it was a line of credit, and instructed that advances on the credit line could

MEMORANDUM OF DECISION – 5

be requested orally or in writing by Kimmes as G&L's president.  Exh. 208

at 2.  The note further provided G&L would be obliged to repay "all sums

either: (A) advanced in accordance with the instructions of an authorized

person or (B) credited to any of [G&L's] accounts with [Evans]."  *Id.*  As

security for Loan Number 4814, Kimmes executed Agricultural Security

Agreements in favor of Evans, granting a security interest in a variety of

collateral owned by both Kimmes and G&L.  Exhs. 226 and 227.

   In April 2008, Evans obtained an advance of $42,000 under Loan

Number 4814; an additional $43,000 was advanced in May 2008.  *Id.*

Kimmes used these funds, in large part, to pay for materials and services

associated with the construction of his new home.  *See* Exh. 200 at 4-5.

   Kimmes testified that, in addition to obtaining Loan Number 4814,

he talked with Chad Brown, his loan officer with Evans, about securing a

long-term mortgage loan for his new house.  In the meantime, Kimmes, as

an individual, signed a promissory note for Loan Number 4921 on July 17,

2008.  Exh. 201.  It was a variable interest rate, twenty-year term loan.  *Id.*

The purpose of the loan, as stated on the associated "Disbursement

MEMORANDUM OF DECISION – 6

Request Authorization," was a "Term Real Estate Closed End Single

Advance." *Id.* Evans secured a ninety percent guarantee on Loan Number

4921 from Farm Service Agency (FSA) as a "Farm Ownership" loan. Exh.

120. After loan fees, a total of $616,310.50 was paid to Kimmes from this

loan. Exh. 201. From these funds, Kimmes paid Land Title & Escrow, Inc.

$334,859.61 in satisfaction of amounts remaining due for the purchase of

real estate on which the home was being built. Exh. 202. Kimmes also

used Loan Number 4921 funds, on July 21, 2008, to pay off a $50,610.27

balance on a short-term loan from Evans. Exh. 202 at 4-5. The remaining

loan proceeds of $231,300.89 were deposited into the G&L checking

account with Evans. Exh. 200 at 9.

While Kimmes testified that Loan Number 4921 funds were used to

pay for his house, bank records show only $146,650.75 was spent on the

house during the period of time the loan proceeds were on deposit in the

G&L checking account. *See* Exhs. 127 and 200 at 9-12. Kimmes testified

that Brown told him he should use the Loan Number 4921 proceeds to pay

for constructing his home, pending receipt of a long-term, conventional

MEMORANDUM OF DECISION – 7

mortgage loan. However, Kimmes' testimony was unclear as to exactly

when the conversation with Brown occurred, whether it was at the time

Loan Number 4921 was funded in July 2008, or at some much earlier time.

Further, Kimmes testified that Brown told him any funds spent on

construction of the home would be reimbursed from the proceeds of the

anticipated conventional home loan Kimmes would obtain, and that loan

would have at least a twenty-year repayment term with a rate of interest of

no more than six percent. However, Kimmes acknowledged that no

specific loan terms, including the exact interest rate, were agreed upon by

he and Brown.

Acting on Brown's instructions, Kimmes submitted a construction

budget for the house to Evans' residential loan officer. Kimmes did not

follow up with the officer after doing so, purportedly assuming his loan

application was in process. However, it is undisputed that Kimmes did

not submit any formal loan application for a residential loan with Evans.

Kimmes also testified that Brown told him not to worry about certain

insufficient funds fees that were being levied against the G&L checking

MEMORANDUM OF DECISION – 8

account for payments being made for construction costs because Evans

would not require Kimmes to pay them.  As things turned out, Evans did

not provide Kimmes with a conventional home loan as he thought it

would.

In contrast to Kimmes' testimony, Brown testified that he did not

recall the purpose of Loan Number 4921, nor did he recall how the

proceeds were to be used.  Indeed, Brown recalled surprisingly little about

his conversations with Kimmes.  Moreover, Brown was not asked whether

he promised Kimmes that Evans would forgive any insufficient funds fees

that were accumulated on the G&L account, totaling approximately $6,000.

Brown also could not recall telling Kimmes that Evans would reimburse

the funds being used from Loan Number 4921 to build his house with

funds from a conventional home loan.  While he remembered facilitating

Kimmes' submission of a house construction budget to Evans' residential

loan officer, he stated that was the extent of his involvement in Kimmes'

attempt to obtain a mortgage loan from Evans.

From August 2008 to December 2008, Evans also advanced funds

MEMORANDUM OF DECISION – 9

from Loan Number 4814 to the G&L checking account.  At the end of

December 2008, Loan Number 4814's principal balance was $236,738.70,

which remained unchanged through May 19, 2009.  Exh. 212.

In November 2008, Brown left Evans, and Don Maier became

Kimmes' new contact.  Kimmes testified that Brown, before leaving his

employment with Evans in November 2008, authorized him to make a

December 2008 construction payment to Larry Brown and promised that

payment would be "covered" with loan proceeds.  By making this

payment, Kimmes insists, the G&L checking account was over-drafted by

$35,000 because loan proceeds were not timely advanced by Evans to

cover the check.

The documentary exhibits tell another story, however, concerning

this overdraft.  They show Kimmes wrote the subject $40,000 check to

Larry Brown on December 15, 2008, and that this check cleared the G&L

checking account two days later, and did not result in an overdraft.  *See*

Exhs. 200 at 20-21 and 216 at 2.  Further, the bank statements indicate that

the checking account had experienced a negative balance frequently

MEMORANDUM OF DECISION – 10

between the time when Chad Brown allegedly authorized Kimmes to pay

Larry Brown, and when Kimmes wrote that check in the middle of

December 2008.  *See* Exh. 200 at 19-21.  While the G&L checking account

did eventually reach a negative balance of approximately $35,000, it was

not until late January 2009.  Exh. 200 at 23.  Kimmes' testimony was vague

at best about the G&L checking account balances, or the amount he owed

to Evans on the various loans he obtained throughout the time line

referenced above.  However, Kimmes acknowledged that during the

relevant times, Evans provided G&L, though Kimmes, monthly checking

account statements that clearly identified all funds deposited into and

disbursed from the account.  These statements also showed the various

overdraft fees being charged to the account.  *See generally* Exh. 200.

Kimmes testified that the continuing insufficient funds fees being

generated on the G&L account were an on-going concern to him, and to

his bookkeeper, but he insists Brown told him he need not worry about

them because Evans would remove all the fees on the account.  When this

conversation occurred is unclear, as was the timing of the conversation

MEMORANDUM OF DECISION – 11

when Brown allegedly told Kimmes that he would be able to obtain a

conventional home loan from Evans.  In Brown's testimony, however, he

did not recall making either promise.

In March 2009, G&L, through Kimmes, obtained yet another line of

credit from Evans, this one in the amount of $334,868 on Loan Number

5161.  Exh. 220.  Loan Number 5161 was used by Kimmes to pay for

personal living expenses, farm operating expenses, the purchase of cattle,

feed and veterinarian services, among other purposes.  Exh. 221.

In the spring of 2009, loan officer Shane Hamblin became Kimmes'

contact with Evans.  Kimmes obtained two additional loans from Evans in

May 2009.  Of particular import in this action, Kimmes and his wife signed

a promissory note for Loan Number 5225 on May 1, 2009.  Exh. 203.  Loan

Number 5225 was a closed end, single advance, variable rate, ten year

term loan for  $297,000.  Exh. 205.  The purpose of the loan was stated in

related paperwork as "Refinance Home loan construction."  *Id*.  Its

proceeds were used to pay off Loan Number 4814, which was the primary

source of funds in the G&L checking account during this time and used by

MEMORANDUM OF DECISION – 12

Kimmes to build the home. Exhs. 203 at 2 and 205. Evans had extended

Loan Number 4814 several times to allow Kimmes to get the loan current.

Exhs. 210 and 211. Loan Number 5225 was offered by Evans in order to

extend Kimmes' repayment term for ten years, an approach the Kimmes

endorsed at the time. Exhs. 203 and 205. As security for Loan Number

5225, Kimmes and his wife granted a deed of trust on their real property

known as 1819 South 2200 East, Gooding, Idaho, to Evans. Exh. 204. The

deed of trust has several unremarkable default provisions, including one

providing that a default would result from the "failure of [Kimmes] within

the time required by this deed of trust to make payments for taxes or

insurance, or any other payment necessary to prevent filing of or to effect

discharge of any lien." *Id.* at 3. Kimmes and his wife also expressly

agreed that they "shall pay when due . . . all taxes, special taxes, [and]

assessments . . . ." *Id.* at 2. Upon default Evans had the option to foreclose

the deed of trust by notice and sale. *Id.* at 4.

The other loan obtained by Kimmes in May 2009, was Loan Number

5234. It was an FSA-guaranteed, revolving operating line of credit for

MEMORANDUM OF DECISION – 13

$298,000, the balance coming due on May 5, 2010.  Proceeds from Loan

Number 5234 of $282,870.97 were used to pay the outstanding balance on

Loan Number 5161.  Exh. 213 and 220.

In 2008 and 2009, Kimmes failed to timely pay his real property

taxes.  Exhs. 113, 115, and 192.  In addition, by June 2010, Kimmes was past

due on several of the loans from Evans.  Exh. 164 at 12-13.  In response,

Evans commenced a foreclosure on the deed of trust for Loan Number

5225, and provided notice to Kimmes of its actions.  Exhs. 204 and 218.

Evans also began a judicial foreclosure in September 2010 on the

mortgages on the farm ground granted by Kimmes to secure Loan

Numbers 4921 and 5234, which were in arrears at the time.  Exhs. 187 and

164 at 16.

## II.   Kimmes' Chapter 12 Case and the Objection to Evans' Proof of Claim

In response to Evans' collection actions, Kimmes filed a chapter 12

petition on January 11, 2011.  Bankr. No. 11-40045-JDP, Dkt. No. 1.  On

February 11, 2011, Evans filed a proof of claim in the bankruptcy case in

MEMORANDUM OF DECISION – 14

the amount of $1,375,990.60.  Claim No. 2-1.  Evans included in its proof of

claim amounts due on Loan Numbers 4921, 5225, 5234, and 4617.  *Id.*

Kimmes filed an objection to the Evans proof of claim on April 8,

2011.  Bankr. Dkt. No. 20.  The bare-bones objection states:  "[t]he basis for

this objection is that, although the debtor agrees that an indebtedness is

owed [to Evans], he objects as to the amount owed.  It is believed that the

amount owed is less than $1,175,000."  *Id.*  Evans filed a response to the

Kimmes objection insisting it was owed the amount stated in its proof of

claim.  Bankr. Dkt. No. 27.  A hearing on the objection was scheduled for

July 13, 2011, Bankr. Dkt. No. 47, however, when the parties indicated to

the Court they had reached an agreement resolving the objection, the

hearing was continued to August 30, 2011.  Bankr. Dkt. No. 56.  After yet

another continuance, the parties advised the Court on September 28, 2011,

that the issues raised by the objection  had not been settled.  Bankr. Dkt.

No. 67.

On October 17, 2011, the Court confirmed Kimmes' second amended

chapter 12 plan.  Dkt. No. 69.  The confirmed plan refers to the Kimmes-

MEMORANDUM OF DECISION – 15

Evans dispute, and provides that Kimmes will pay all amounts owed to

Evans as determined by the Court thereafter.  Dkt. No. 68 at 5-6.  Evans

did not contest Kimmes' plan.

### III.    The Adversary Complaint and the Trial

Kimmes commenced this adversary proceeding against Evans on

August 10, 2012.  Adv. No. 12-08067-JDP, Dkt. No. 1.  Kimmes' complaint

consists of ten "counts."  *Id.*  The complaint is inartfully drafted, and as

discussed below, the relief sought is limited.

Count One of the complaint alleges, in total, that "[Kimmes] is

authorized to incorporate in an adversary action his objection to a proof of

claim.  That basis for objection is for the reason specified hereafter as to the

indebtedness referred to in Loan No. . . . 5225/04 owed to [Evans.]"  *Id.* at

¶ 5.

Count Two provides, in summary, that because a loan officer at

Evans allegedly promised Kimmes a "regular home loan," but did not

follow through on this promise, Kimmes was required to pay a higher

interest rate on the loan he was eventually provided.  Adv. Dkt. No. 1 at

MEMORANDUM OF DECISION – 16

¶ 6.  Count Two further alleges Evans breached an unspecified agreement it made with Kimmes and FSA, because Evans "had [Kimmes] use FSA guaranteed operating loan funds" inappropriately to build his house.  *Id.* at ¶ 7.  Kimmes alleges he "incurred significant damages" on account of Evans' actions.  *Id.* at ¶ 9.

Count Three focuses upon the insufficient funds fees in the amount of $6,760 charged to Kimmes, which he alleges, Evans "represented that it would remove" but did not do so.  *Id.* at ¶¶ 10 and 11.

Count Four alleges that Evans' loan officer, Chad Brown, failed to honor his promise to cover an unspecified "$40,000 check" written on the G&L checking account, which caused an overdraft in the account.  *Id.* at ¶¶ 12 and 13.

Count Five alleges that Evans failed to cover a check Kimmes wrote to pay insurance premiums sometime in January 2009 to keep "the property" insured.  *Id.* at ¶ 14.  As a result, Kimmes had to use "personal funds" to cover a $2,313 bill.  *Id.* at 16.

Count Six alleges, like Count Two, that Evans promised a "house

MEMORANDUM OF DECISION – 17

loan" with better terms than Loan Number 5225, and failed to provide

such a loan. *Id.* at ¶ 18. Remarkably, Count Six candidly admits Kimmes

found it "impossible . . . to determine how much in fact at any give time

was owed to [Evans,]" and he attributes this difficulty to the "change in

Bank personnel," which was "all to [Kimmes'] further damage." *Id.* at

¶ 19.

Count Seven deals again with the insufficient funds fees, and alleges

"further damages" were incurred by Kimmes due to Evans' failure to pay a

$14,000 check for replacement of a roof of "the shop." *Id.* at ¶¶ 20- 22.

Count Eight alleges that Evans failed to timely respond to his

requests for an operating loan "in the Year 2010," and thus, Kimmes was

required to obtain the loan from another bank. *Id.* at ¶ 23.

Count Nine contends that Evans failed to send him a "demand letter

or acceleration letter with respect to any loans," thereby depriving him of

any opportunity to "cure a claimed default." *Id.* at ¶ 24. This Count also

alleges that Kimmes gave Evans $2,484.13 "to pay insurance and a pickup

payment" but Evans failed to apply those funds appropriately, which

MEMORANDUM OF DECISION – 18

resulted in Evans filing a legal action against Kimmes even though he was

"current." *Id.* at ¶ 25.

Finally, Count Ten alleges that Evans inappropriately commenced a

non-judicial foreclosure on his house for failure to timely pay real property

taxes without giving Kimmes any "written demand" for the payment of

the taxes, which caused Kimmes to incur "foreclosure fees." *Id.* at ¶ 27.

The final numbered paragraph of the complaint then states, "[t]hat all of

the damages referred to above with respect to the one loan should be

found to be not owed and that this obligation shall be extinguished." *Id.* at

¶ 28.

After all of these allegations, Kimmes' complaint "prays that the

Court find that nothing is owed with respect to [Loan Number 5225] and,

that the [c]hapter 12 [p]lan should be modified accordingly." *Id.* at 6.

Evans filed an answer to the complaint denying all of its material

allegations and disputing Kimmes' right to any relief.  Adv. Dkt. No. 8.

After discovery and other non-dispositive proceedings, the adversary

proceeding came on for trial before the Court.  Notably, and despite the

MEMORANDUM OF DECISION – 19

language in his complaint, focusing solely on "the one loan;" in his pretrial brief, Kimmes asked this Court to make an affirmative award of money damages to Kimmes, rather than to simply determine whether anything was owed by Kimmes to Evans on Loan Number 5225. Adv. Dkt. No. 42 at 8. This request to recover an unstated amount of damages, made only two weeks before the trial, understandably took Evans by surprise. When the trial commenced on September 5, 2013, Evans' counsel objected to Kimmes' apparent efforts to amend the relief he had sought in the complaint, not in an amended complaint, but informally through the pretrial brief. Counsel for Kimmes, seemingly recognized the problem, then made an oral motion to amend the complaint. The Court denied the motion, ruling that under these circumstances, Kimmes would be limited to the relief stated in the complaint.

The trial in this action consumed most of four days during which the Court heard the testimony of 10 witnesses; hundreds of pages of documentary exhibits (many of which were unrelated to the real issues in the action) were submitted by the parties. At the conclusion of the trial,

MEMORANDUM OF DECISION – 20

the issues were taken under advisement, and the parties filed post-trial

closing arguments.  Undeterred by the Court's ruling before the trial

began,[4] Kimmes, in the conclusion to his rebuttal brief[5] argues that Evans

"had notice that Kimmes might object to a larger portion of his

indebtedness [beyond Loan Number 5225] and should have been prepared

to defend such.  Therefore, [Kimmes] still requests that this Court grant

him an offset toward Defendant in the amount of $640,299.29."  Adv. Dkt.

No. 66 at 8.[6]

---

[4]  Kimmes has never filed a motion to amend the complaint as required by
Rule 7015/Civil Rule 15, nor has he ever submitted a proposed amended
complaint.  He also never asked the Court for relief from its order denying the
his motion to amend made at the beginning of the trial.

[5]  Kimmes's"rebuttal brief" was filed three days later than ordered by the
Court at the conclusion of the trial.  *See* Dkt. No. 63.  Though no excuse or
explanation for this tardy submission was offered by Kimmes' counsel, the Court
exercises its discretion to consider the late-filed brief, even though counsel
should properly have requested an extension of time to file the brief.

[6]  Kimmes' $640,299.29 claim for an "offset" was not mentioned in either
the complaint, nor at trial.  This figure was computed for the first time in
Kimmes' proposed findings of fact and conclusions of law and brief filed several
weeks after the trial concluded.  Dkt. No. 64 at 10.  The figure includes, among
other components, "insufficient financing to farm [Kimmes'] ground [of]
$255,780," as well as a loss "due to inability to use commercial fertilizer in 2011,
2012, 2013 [of] $142,000."  *Id.* at 10, ¶ 70.

MEMORANDUM OF DECISION – 21

*Analysis and Disposition*

**I.     Pleading Standards and Amendments to Conform
         Pleadings to Proof  at Trial**

As an initial matter, the Court hereby reiterates its intention and

decision to confine the issue to be decided in this action to only that

properly pled in Kimmes' complaint: whether Kimmes is indebted to

Evans on Loan Number 5225.

Civil Rule 8(a) applies in adversary proceedings via Rule 7008; it

provides,

> Claims for Relief.  A pleading that states a claim for relief
> must contain: (1) a short and plain statement of the
> grounds for the court's jurisdiction . . . ; (2) a short and
> plain statement of the claim showing that the pleader is
> entitled to relief; and (3) a demand for the relief sought  .
> . . .

Civil Rule 8(a)(2) requires "only 'a short and plain statement of the claim

showing that the pleader is entitled to relief,' in order to 'give the

defendant fair notice of what the . . . claim is and the grounds upon which

it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting

Civil Rule 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).   However,

MEMORANDUM OF DECISION – 22

the complaint "'must contain something more . . . than . . . a statement of

facts that merely creates a suspicion of legally cognizable right of action.'"

*Id.* (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216,

pp. 235-36 (3d ed. 2004)).

Applying these well-established principles in this case, Kimmes'

complaint failed to give Evans notice of the legal grounds upon which he

intended to show he was entitled to the relief requested under any of the

counts of the complaint.  Beyond this, the complaint failed to adequately

disclose, or even mention, several of the factual positions Kimmes would

later argue in his post-trial brief.  Finally, the complaint's prayer for relief

did not inform Evans that Kimmes would seek anything other than an

offset against amounts owed on Loan Number 5225 as a remedy for Evans'

alleged wrongs.

Kimmes, or more precisely, his counsel, argues that Kimmes' prayer

for expanded relief should be allowed because he only became aware of

the "true extent" of Kimmes' damages during the  trial.  *See* Plaintiff's

Rebuttal Brief, Adv. Dkt. No. 66 at 3 ("As the true extent of the harm done

MEMORANDUM OF DECISION – 23

to Kimmes became clear at trial, he should be able now to claim an offset

for the entire extent of his damages.").

There is some support for Kimmes' position.  After all, Evans did not

challenge Kimmes' complaint under Civil Rule 12 before the trial

commenced, a trial was conducted, and Civil Rule 54(c)[7] instructs that the

Court may award relief to which a party is entitled, regardless of whether

the relief was plead, so long as the failure to request the appropriate relief

does not prejudice the opposing party.  *See Channel Ltd. P'ship v. Home Box*

*Office, Inc.*, 931 F.2d 1338, 1341 (9th Cir. 1991); *Hopkins v. D.L. Evans Bank*

*(In re Fox Bean Co.)*, 287 B.R. 270, 289 (Bankr. D. Idaho 2002).  However,

prejudice exists if the opposing party would have submitted additional

evidence at trial not relevant to the issues raised by the heedless pleader.

*In re Fox Bean Co.*, 287 B.R. at 289.   And as the Ninth Circuit Bankruptcy

---

[7] Civil Rule 54(c), incorporated by Rule 7054, provides, in relevant part:

Every other final judgment should grant the relief to which
each party is entitled, even if the party has not demanded that
relief in its pleadings.

MEMORANDUM OF DECISION – 24

Appellate Panel has discussed, there are limits to a trial court's discretion

under Civil Rule 54(c):

> A court may not, without the consent of all persons
> affected, enter a judgment which goes beyond the claim
> asserted in the pleadings. "Unless all parties in interest
> are in court and have voluntarily litigated some issues not
> within the pleadings, the court can consider only the
> issues made by the pleadings, and the judgment may not
> extend beyond such issues nor beyond the scope of the
> relief demanded."

*Delaney-Morin v. Day (In re Delaney-Morin)*, 304 B.R. 365, 370-71 (9th Cir.

BAP 2003) (quoting *Sylvan Beach Inc. v. Koch*, 140 F.2d 852, 861 (8th Cir.

1944)).

Here, Evans made it clear at the beginning of the trial it objected to

Kimmes' analysis of the issues and scope of relief discussed in his pretrial

brief, and that Evans would not consent to an expansion of the claims,

issues, or relief beyond that requested by Kimmes in his complaint.

Further, after the trial, Evans disputed (and refuted) the computation of

damages set forth for the first time by Kimmes in his post-trial brief.  *See*

Defendant's Response Brief, Adv. Dkt. No. 65 at 12-13 ("While [Kimmes']

MEMORANDUM OF DECISION – 25

proposed findings of fact in his post-trial brief identify nine different

sources of damages . . . his Complaint only pleads two of those sources of

damages . . . [t]hose [actually pled sources of damage] are the only

damages and claims [Kimmes] pled sufficiently to allow [Evans] adequate

notice to respond to the allegations through its answer, discovery, and

other trial preparations.").

All things considered, the Court concludes, in an exercise of its

discretion, that Evans would be severely prejudiced were the Court to

entertain Kimmes' amended, indeed enhanced, claims for offsets and

damages beyond that relief specifically requested by Kimmes in his

complaint.  Clearly, Evans did not voluntarily agree to litigate Kimmes'

claims to recover damages addressed for the first time in his post-trial

brief.  According to the complaint, while Kimmes asserted several distinct

claims, and alleged that Evans engaged in a variety of wrongful conduct,

Kimmes' prayer for relief makes clear that he was solely concerned with

disputing the amounts Evans claimed to be due on only one of several of

his outstanding loans: Loan Number 5225.  The Court will therefore

MEMORANDUM OF DECISION – 26

evaluate below only those claims Kimmes asserts that may be offered to

offset amounts he otherwise owes to Evans on Loan Number 5225.

## II.   Statute of Frauds, Promissory Estoppel, Good Faith, and the Remaining Counts of the Complaint

The Court will first address the legal theories enunciated by Kimmes

in his briefs.  It will then analyze the other "counts" of Kimmes' complaint,

even though no arguments were advanced concerning many of these

claims at trial, or in Kimmes' briefs.[8]

While Kimmes' complaint neglects to discuss any legal basis or

authority for his claims, in his pretrial brief, Kimmes invokes the doctrine

of promissory estoppel to support his claims targeting Evans' agents'

alleged unfulfilled promises regarding the insufficient funds fees and to

provide Kimmes with an acceptable "conventional mortgage."  Adv. Dkt.

---

[8] Kimmes seems to have abandoned these other counts of the complaint in his post-trial filings with the Court.  Even so, to be comprehensive, the Court will consider them, based upon the proffered evidence and testimony, to determine if any relief is warranted.

MEMORANDUM OF DECISION – 27

No. 42 at 5-6.[9]  In addition, the pretrial brief argues Evans breached a

covenant of good faith and fair dealing because Evans violated an

agreement with FSA and because "Evans should have allowed [Kimmes]

to obtain a normal mortgage for his home construction."  *Id.* at 8.  Kimmes'

post-trial brief again focuses on the alleged breach by Evans of the

covenant of good faith and fair dealing arguing that Evans' agents

instructed him inappropriately to use FSA-guaranteed loan proceeds to

build his house, and because Evans allegedly did not follow its own

internal policy on servicing troubled loans.  Adv. Dkt. No. 64.

Of course, there are no writings to evidence the promises Kimmes

alleges were made to him by Evans' representatives, which he asserts were

subsequently breached.  This is a problem for Kimmes.  Idaho Code § 9-

505, Idaho's Statute of Frauds, provides:

In the following cases the agreement is invalid, unless the

---

[9]  Kimmes also claims he is entitled to relief based on Evans' "promise,"
through Brown, to cover his $40,000 check to Larry Brown.  However, as
discussed above, the Court finds, as a matter of disputed fact, that the $40,000
check did not result in an overdraft of the G&L checking account as argued by
Kimmes.  *See supra,* Fact Section; *see also* Exhs. 200 at 20-21 and 216 at 2.

MEMORANDUM OF DECISION – 28

same or some note or memorandum thereof, be in writing and subscribed by the party charged, or by his agent. Evidence, therefore, of the agreement cannot be received without the writing or secondary evidence of its contents: . . . (5) A promise or commitment to lend money or to grant or extend credit in an original principal amount of fifty thousand dollars ($50,000) or more, made by a person or entity engaged in the business of lending money or extending credit.

In order to avoid the operation of this statute, Kimmes relies on the doctrine of promissory estoppel. Adv. Dkt. No. 42 at 6.

"Promissory estoppel, generally speaking, means that 'a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *Bank of Commerce v. Jefferson Enters., LLC*, 303 P.3d 183, 194 (Idaho 2013) (quoting *Smith v. Boise Kenworth Sales, Inc.*, 625 P.2d 417, 421-22 (Idaho 1981)). However, promissory estoppel is not properly invoked as an exception to the statute of frauds in cases dealing with a bank promising to lend money above the statutory amount. *See Bank of Commerce*, 303 P.3d at 194 (holding promissory estoppel was not

MEMORANDUM OF DECISION – 29

applicable to save a borrower from the effect of the statute of frauds even

though the bank orally committed to a mortgage for borrower because the

agreement was not in writing); *Lettunich v. KeyBank Nat. Ass'n*, 109 P.3d

1104, 1109 (Idaho 2005) (holding that an oral agreement by a bank to lend

to the borrower was unenforceable due to the statue of frauds and that

promissory estoppel did not compel a different result).[10]  Applying these

principles to this case, Kimmes' position lacks merit.

  First, with respect to the purported Evans promise to remove the

---

[10]  Kimmes likely intended to argue equitable estoppel because it is a recognized exception to the statute of frauds.  *Ogden v. Griffith*, 236 P.3d 1249, 1254-55 (Idaho 2010) (stating "we find that equitable estoppel is an appropriate ground for avoidance of the statute of frauds . . . .").  Promissory estoppel and equitable estoppel, although perhaps occasionally confused, "are distinct concepts with distinct uses and effects."  *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 918 (9th Cir. 2001).  "Promissory estoppel is used to create a cause of action, whereas equitable estoppel is used to bar a party from raising a defense or objection it otherwise would have . . . [p]romissory estoppel is a sword, and equitable estoppel is a shield."  *Id.* (quoting *Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir. 1981) (internal quotation marks omitted)).  Kimmes' possible error in nomenclature is of no consequence in this case, however, since even applying equitable estoppel to the facts, Kimmes' claims fail.  Kimmes never proved Evans made any false representations, nor that Evans concealed any material facts with actual or constructive knowledge of the truth.  *See Old Cutters v. City of Hailey (In re Old Cutters)*, 488 B.R. 130, 148 (Bankr. D. Idaho 2012) (stating the elements of equitable estoppel in Idaho).

MEMORANDUM OF DECISION – 30

insufficient funds fees on the G&L checking account, the Court concludes

Kimmes has not adequately proven such a promise was ever made.

Kimmes testified that he was promised by Brown that the fees would be

removed; Brown did not recall ever making that promise.  On balance, the

Court believes Brown.

Next, with respect to the purported Evans promise to give Kimmes a

"conventional mortgage" for funds spent from other loans to build his

home, the Court similarly concludes that evidence of the details of the

alleged promise is lacking.  Kimmes testified Evans' promised, through

Brown, to assist him in applying for a "conventional mortgage," but the

proof is inadequate that Evans promised anything more – *i.e.* to actually

make him such a loan.  There was no discussion of the terms of such a

loan, and certainly an agreement was never reached as to those terms.

Again, Brown testified that, beyond agreeing to submit Kimmes' cost

figures to an Evans mortgage loan officer, he did not recall making any

promises or discuss specific mortgage terms with Kimmes.  Even were

those terms settled, which they were not, Idaho Code § 9-505(5) renders

MEMORANDUM OF DECISION – 31

such an agreement unenforceable, because the amount of that loan would

clearly have exceeded $50,000, and it was not reduced to a writing signed

by the party to be charged, Evans.  Moreover, as noted above, promissory

estoppel does not overcome the barrier statute of frauds.  *See Bank of*

*Commerce*, 303 P.3d at 194; *Lettunich*, 109 P.3d at 1109.

Kimmes argues that Evans also breached the implied covenant of

good faith and fair dealing justifying relief.  The Court disagrees.  "Idaho

law 'implies a covenant of good faith and fair dealing when doing so is

consistent with the express terms of an agreement between contracting

parties . . . .'"  *Bank of Commerce*, 303 P.3d at 190 (quoting *Noak v. Idaho*

*Dep't of Correction*, 271 P.3d 703, 707 (Idaho 2012)).  However, "[s]uch a

claim may only be asserted by parties to a contract.  'Even then, one can

maintain a claim for breach of the covenant only when he or she is denied

the right to the benefits of the agreement the parties entered into.'"  *Id.*

(quoting *Idaho Power Co. v. Cogeneration, Inc.*, 9 P.3d 1204, 1214 (Idaho

2000)).  And "[t]he covenant requires that the parties perform, in good

faith, the obligations imposed by their agreement."  *Id.*  Here, the Court

MEMORANDUM OF DECISION – 32

concludes there was no agreement between the parties, and certainly no

formal contract, whereby Evans agreed to finance Kimmes via a

"conventional mortgage."  Further, Kimmes has identified no other

contractual provisions in the parties' other various contracts that Evans

ignored.  Instead, the Court finds Evans generally acted in accordance with

the parties' various agreements, and thus, Kimmes' claim fails.

Finally, Kimmes' cryptic reference in his briefs to Evans' alleged

breach of an unspecified agreement between FSA, Kimmes, and Evans, by

encouraging him to inappropriately use operating loan proceeds is not

supported by the evidence.  Even assuming there was such an agreement,

Kimmes does not establish how his use of FSA-guaranteed operating loan

proceeds, allegedly based on Evans' recommendation, caused him any

quantifiable loss.  Indeed, Kimmes was never defaulted on the FSA loan

because he improperly used the proceeds.

Similarly, Kimmes cites no legal basis for his claim that, in its

collection actions taken again him, Evans' alleged failure to conform to its

internal  policies in dealing with troubled loans should inure to his benefit.

MEMORANDUM OF DECISION – 33

In aggressively seeking to collect from him without affording him the courtesy of more or different demands that he comply with his loan agreements, perhaps Evans treated Kimmes poorly, but this is not a basis for affirmative relief.  While Evans' alleged failure to give him "extra" notices about his defaults, and its other hardball tactics toward him, may have justified his cessation of business with Evans, its tactics did not amount to grounds to sue the bank.

The other claims in Kimmes' complaint are set forth in Counts Five, Seven, Eight, Nine, and Ten.  As stated above, Kimmes has apparently abandoned these claims, as they were not supported at trial by the submission of evidence and testimony, nor were these counts even mentioned in Kimmes' post-trial briefs.  In the interests of economy, however, the Court will review these counts to determine if Kimmes is entitled to any relief.

Count Five alleges that a Kimmes' check to pay insurance premiums, written in January 2009, was not covered by Evans, which required Kimmes "to indicate for the insurance company that there had been no

MEMORANDUM OF DECISION – 34

losses during the time in question." Adv. Dkt. No. 1, at ¶ 16. Evans'

refusal to honor the check also allegedly caused Kimmes to use "personal

funds" to cover the payment and these facts resulted in "further damage"

to Kimmes. *Id.* at ¶ 16-17. There is no legal theory stated in the complaint

on which Kimmes relies, or that the Court can conceive of, that would

allow the Court to grant any relief as to this count. Notably, the Evans

bank statements for the G&L checking account dated January 30, 2009,

shows a balance of negative $34,842.21. Exh. 200 at 22. The fact that Evans

did not cover a check written on an overdrawn account is not surprising,

and under these facts, certainly not actionable.

Count Seven deals again with insurance, focusing on Evans'

purported failure to allow Kimmes to make a payment of $14,000 on an

insurance policy that covered his shop, which caused "further damages" to

Kimmes. *Id.* at ¶ 22. Kimmes again provides no legal theory that would

entitle him to recovery here, and the Court is not aware of one. Moreover,

proof of any damages Evans caused Kimmes is lacking. The Court finds

Kimmes is not entitled to relief under this count of the complaint.

MEMORANDUM OF DECISION – 35

In Count Eight, Kimmes in essence alleges he was forced to obtain an operating line of credit from Magic Valley Bank in 2010 because Evans would not provide him with adequate credit.  Again, no legal theory is alleged that would entitle Kimmes to relief, and the Court is once again not aware of one.  Further, it was clear that Kimmes' financial position had deteriorated considerably in 2010.  That Evans was not willing to provide further loans to Kimmes at this point is unremarkable and should have been predictable.  Therefore, the Court concludes Kimmes is not entitled to relief under this count of the complaint.

Count Nine deals primarily with a payment of $2,484.13 made by Kimmes to Evans for insurance coverage and as a payment on a his pick-up loan that Evans allegedly did not apply to the loan.  *Id.* at ¶ 25.  Evans purportedly then commenced an action to repossess the vehicle, and this caused Kimmes to incur legal fees.  *Id.*  Again, no legal theory is advanced by Kimmes that would entitle him to any relief, although viewed liberally, the count might state a claim against Evans for simple breach of contract.  However, the claim fails because Evans appears to have acted properly in

MEMORANDUM OF DECISION – 36

suing to collect the loan upon Kimmes' default, even though it might have accommodated his efforts to resolve this issue. Kimmes may have incurred legal costs in resolving Evans' claim, which was arguably unnecessary, however, Kimmes has not established any right to recover from Evans.

Finally, Count Ten deals with Evans' actions to foreclose on the real property that secured the various loans it made to Kimmes due to his failure to timely pay property taxes. *Id.* at ¶ 27. Kimmes alleges that Evans foreclosed without providing a written demand for him to pay the taxes. *Id.* As pointed out above, Kimmes' failure to pay taxes is an event of default according to the loan documents, and Evans was within its legal rights in acting to foreclose. While this is yet another example of how Evans declined to offer Kimmes courtesies that would have more easily resolved his default, Kimmes has not disputed that he failed to timely pay the taxes as required by his mortgages. Kimmes therefore is not entitled to recover from Evans any of the foreclosure costs he was required to pay to stop the foreclosure process.

MEMORANDUM OF DECISION – 37

*Conclusion*

Reading his complaint fairly, Kimmes sought to defend against
Evans' right to collect sums remaining due on his Loan Number 5225
based on the acts and omissions of Evans' agents. Kimmes' additional
claims for relief, including his request for an award of damages from
Evans, clearly were not adequately or timely asserted, and were the Court
to consider them, it would severely prejudice Evans' right to defend
against those claims. Moreover, even if Kimmes' various claims are
considered, he has not shown that he is entitled to any relief. In short, the
Court concludes that Kimmes has proven no right to relief in general, and
specifically, that Kimmes failed to establish any reason why Evans should
not collect the amounts due to it on Kimmes' various loans as identified in
Evans' proof of claim.[11]

The Court concludes that judgment should be granted in favor of
Evans in all respects. Counsel for Evans shall prepare and submit an

---

[11] Of course, as mentioned above, Kimmes' obligation to pay Evans'
claims is governed by the terms of the confirmed chapter 12 plan in this case.

MEMORANDUM OF DECISION – 38

appropriate form of judgment consistent with this Memorandum for entry

by the Court.  Counsel for Kimmes shall approve the form of judgment.


Dated:  February 10, 2014

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION – 39